**The PEOPLE of the State of Colorado,**
**Plaintiff–Appellee,**

v.

**Allen Charles BERGERUD,**
**Defendant–Appellant.**

No. 06CA0013.

Colorado Court of Appeals,
Div. I.

Sept. 18, 2008.

Rehearing Denied Oct. 16, 2008.

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2007.

580

John W. Suthers, Attorney General, Paul Koehler, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Samler & Whitson, P.C., Hollis A. Whitson, Eric A. Samler, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge CONNELLY.

Defendant, Allen Charles Bergerud, appeals his murder and assault convictions after a trial in which he represented himself. We reverse the convictions and remand for a new trial because defendant's constitutional right to counsel was violated by requiring him to choose between having counsel or an innocence defense.

## I. Background

Defendant originally was charged with capital murder for killing his ex-girlfriend L.C. and her male companion L.Y. The prosecution's evidence showed defendant lured the woman to a remote field at night on the pretense her horses were running loose from their nearby pasture. When she arrived with a male companion, defendant repeatedly shot and killed the man. The woman escaped temporarily to make a frantic 911 cellphone call, but returned to try unsuccessfully to aid the man. The 911 operator heard her scream defendant had returned, and also heard defendant curse her for having left him. When sheriff's deputies arrived, they ordered defendant to drop his weapon. Instead, he fired several shots killing the woman, and then fired at the deputies. The deputies ultimately were able to arrest defendant, who was shot in the hand by either his own or the deputies' fire.

## A. The First (Hung Jury) Trial

The initial capital trial, in which defendant was represented by retained counsel, resulted in a hung jury. The court had not instructed the jury on any homicide offenses less than first degree murder. The People proposed an instruction on second degree murder, but defense counsel objected, explaining it was "specifically at the defendant's request" that counsel had sought to avoid any lesser offense instructions. After the court ruled the defense could reopen its case, the prosecution withdrew its request for a second degree murder instruction. The court said this decision "isn't something we're going to do without" speaking personally to defendant. The court explained the "risks" of forgoing lesser homicide offenses, and defendant confirmed he understood and had discussed these with his attorney. Defendant said he did not want the jury instructed on any lesser homicide offenses. The court accordingly instructed only on first degree murder.

The defense argued to the first jury that defendant had not acted with the deliberation and mental state necessary for first degree murder. These arguments relied in part on defendant's low IQ and drunken, agitated state at the time of the killings.

The jury, left with a binary choice of convicting defendant of first degree murder or acquitting him of homicide, could not reach a unanimous verdict. It deliberated for several days and received supplemental instructions from the court, but it ultimately had to be discharged because it was deadlocked.

## B. The Second Trial

The prosecution subsequently withdrew the death penalty request and the case proceeded to a second non-capital trial in which defendant initially was represented by appointed counsel. He ended up representing himself after things went awry following defense counsel's opening statement. Defendant proceeded unrepresented for the remainder of trial.

### 1. Defense Counsel's Opening Statement

Defense counsel stated in her opening, "[W]hat happened in that field that night was not calculated. It was not planned. It was not first degree murder after deliberation." She added, "[I]t may be that Mr. Bergerud doesn't know how things happened out there, or that he's convinced himself otherwise." She then discussed defendant's low IQ, extreme diabetes, and voluntary intoxication that night.

Defense counsel stated that when the ex-girlfriend "showed up in that field that night with [a male companion, defendant] Allen Bergerud broke. He literally just broke." She explained defendant "was not very stable to begin with, and you add to that the diabetes and the brain damage and the mental illness and the intoxication, and he broke." Counsel noted the difference between someone who coolly plans a killing and "someone who on their worst day at their worst level of functioning reach[es] their breaking point, loses it, and does something catastrophic that they did not plan." She told the jury the defense would ask it to find defendant "not guilty of charges that require proof of intent and . . . deliberation."

### 2. Defendant's Objection and the Conferences

Immediately after this opening, the other defense counsel told the court they needed to talk with defendant. The court recessed and then met in chambers with defendant, his attorneys, and the prosecution. Defendant told the court he wanted to "fire [his] attorneys" because there was "a conflict of interest" regarding the defense to be presented at trial. Defendant complained that even after arguments at the jail his attorneys "continued on, paying no attention to what [he was] telling them happened that night."

The prosecutor said, "[A]t this stage of the game, the case law is pretty clear. He continues with current representation or he represents himself." The court agreed and told defendant those were his "two options." The court dismissed the jury until the next afternoon so the parties could discuss the issue in more detail.

In chambers with only defendant and his counsel present, the court asked defendant to describe his relationship with counsel and how he wanted the case defended. Defendant said he wanted a self-defense case, had told this to the public defenders, and had provided them a letter from his retained counsel at the first trial opining this was how the case should be defended. Defendant said he had "thought [they] were making progress o[n] how they would go about defending this case, and [he] was totally shocked when they came out with opening statement." After some further discussion, the court adjourned for the evening.

### 3. Defendant's Waiver of Counsel

The next day, the court and parties had additional discussions in chambers. Some of those discussions again occurred outside the presence of the prosecution.

Defendant provided more detail regarding the conflict with his attorneys. He repeated that he had provided those attorneys with a letter from his first attorney recommending self-defense. Defendant told the court he had not previously understood this to be "separate" from the "toxicology and mental impairment" defense pursued at the first trial. He said his new appointed counsel "felt that toxicology and mental impairment was a good defense, and [he had] told them [he] . . . had an excellent attorney the first time and it didn't work with that type of defense; that we needed to go with self-defense." Defendant added repeatedly, without contradiction, that his attorneys would not raise self-defense.

The court recognized that, while the theory outlined in the opening statement was similar to that in the first trial, it would have different consequences because there had been no lesser homicide offenses in the first trial. It noted "in the first trial it was an all or nothing deal, and obviously that's not what the strategy has been at this point." The court advised defendant that this strategy could result in his conviction of "something less than first degree murder" such as second degree murder, manslaughter, or even assault. Defendant said he understood but did not want this defense.

Defendant repeatedly said he did not want to proceed without counsel. He reiterated he wanted to have counsel *and* to raise a self-defense claim. Defendant alternatively requested advisory counsel but the court concluded this was not practicable.

The court ruled there was no "conflict of interest" requiring new counsel because "the conflict [was] over strategy." It gave defendant the choice of having: (1) counsel but no self-defense claim; or (2) a self-defense claim but no counsel. Defendant chose the latter. The court did not finally effectuate the choice until determining the prosecution would not object to an untimely self-defense claim. It then ruled it "will allow self-defense if you represent yourself." The court acknowledged defendant was given "difficult choices" and had defendant confirm "under the choices [the court had] given" that he wished to proceed without counsel.

### 4. Trial and Conviction

Trial resumed that afternoon with defendant representing himself. The court told the jury defendant had been allowed to discharge his attorneys, raise a self-defense claim, and make a new opening statement. Defendant's representation of himself throughout trial was inartful at best.

Defendant testified in his own behalf. He claimed he shot at the man in self-defense but that sheriff's deputies accidentally shot the woman. Based on this testimony, the court gave a self-defense instruction as to the man but not the woman decedent.

The prosecution requested jury instructions on the lesser offense of second degree murder. The court overruled defendant's objection, and ultimately instructed on second degree murder as well as lesser homicide offenses. The jury convicted defendant of first degree murder of the man, second degree murder of the woman, and assault of the officers.

### II. Discussion

■ Defendant had a right to counsel under the federal and state constitutions. *See* U.S. Const. amend. VI; Colo. Const. art. II, § 16. A waiver of this fundamental right is valid only if it is knowing and voluntary. *See, e.g., Indiana v. Edwards,* — U.S. —, 128 S.Ct. 2379, 2383–84, 171 L.Ed.2d 345 (2008); *Hinojos–Mendoza v. People,* 169 P.3d 662, 669 (Colo.2007); *People v. Campbell,* 58 P.3d 1148, 1155 (Colo.App.2002). Appellate review of such a waiver's validity is de novo. *People v. Alengi,* 148 P.3d 154, 159 (Colo.2006); *People v. Wallin,* 167 P.3d 183, 189–90 (Colo.App.2007).

■ We must decide whether defendant's waiver of counsel was voluntary in light of the choices he was given. Though the trial court extensively questioned defendant as required by *People v. Arguello,* 772 P.2d 87, 95–98 (Colo.1989), the waiver cannot be valid if it was based on an impermissible choice. *See Campbell,* 58 P.3d at 1157–58; *Pazden v. Maurer,* 424 F.3d 303, 313–18 (3d Cir.2005); *Wilks v. Israel,* 627 F.2d 32, 35 (7th Cir. 1980).

The trial court, starting with the premise that the attorney-client dispute involved "trial strategy," required defendant to choose between having counsel but no self-defense claim or a self-defense claim but no counsel. Only after being told he would not be provided counsel to advocate his innocence of all homicide offenses did defendant choose to proceed without counsel.

The issue, therefore, is whether the trial court correctly ruled the dispute involved strategic judgments entrusted to counsel. If so, it was not a "conflict of interest" establishing "good cause" for the appointment of new counsel. *People v. Garcia,* 64 P.3d 857, 863–64 (Colo.App.2002). The court then properly could have required defendant to choose between having counsel or pursuing his own strategy without counsel.

### A. The Distinction Between "Fundamental" Decisions Made by Defendants and "Strategic" Decisions Made by Counsel

The Supreme Court has interpreted the Sixth Amendment as providing an "implied" right (one "not stated in the Amendment in so many words") "to defend [that] is given directly to the accused; for it is he who suffers the consequences if the defense fails."

*Faretta v. California,* 422 U.S. 806, 819–20, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Our state constitution makes this explicit by giving an accused "the right to appear and defend in person and by counsel." Colo. Const. art. II, § 16. This means that "however expert, [a defense lawyer] is still an assistant" and not a "master" because otherwise "the right to make a defense [would be] stripped of the personal character upon which the [Constitution] insists." *Faretta,* 422 U.S. at 820, 95 S.Ct. 2525.

■ Accordingly, some decisions must be made by a criminal defendant personally and not by counsel. These "fundamental decisions regarding the case," over which "the accused has the ultimate authority," include whether to plead guilty, testify on his own behalf, waive a jury trial, or take an appeal. *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Such "decisions implicate inherently personal rights which would call into question the fundamental fairness of the trial if made by anyone other than the defendant." *Arko v. People,* 183 P.3d 555, 558 (Colo.2008) (citing *People v. Curtis,* 681 P.2d 504, 512 (Colo.1984)); *see also Gonzalez v. United States,* — U.S. —, 128 S.Ct. 1765, 1771, 170 L.Ed.2d 616 (2008) ("some basic trial choices are so important that an attorney must seek the client's consent in order to waive the right").

In contrast, "[o]ther decisions are regarded as strategic or tactical in nature, and final authority to make such decisions is reserved to defense counsel." *Arko,* 183 P.3d at 558. On issues of trial strategy, defense counsel is " 'captain of the ship.' " *Id.* (quoting *Steward v. People,* 179 Colo. 31, 34, 498 P.2d 933, 934 (1972)).

■ No precise test separates fundamental decisions within defendants' final control from strategic decisions left to counsel. Wayne R. LaFave et al., *Criminal Procedure* § 11.6(c), at 796 (3d ed.2007). Even the most fundamental decisions—such as whether a defendant should accept a guilty plea or take the witness stand—are strategic ones that experienced counsel might be able to make better. But because the defendant ultimately "suffers the consequences" of those decisions, *Faretta,* 422 U.S. at 819–20, 95 S.Ct.

2525, they are too important to be taken out of the defendant's hands.

The issue is also addressed by ethical rules. *See Arko,* 183 P.3d at 558–60 (discussing Colorado ethical rule and ABA standards). Colorado Rule of Professional Conduct 1.2 addresses the "Scope of Representation and Allocation of Authority Between Client and Lawyer." Under it, a client decides "the objectives of representation" while an attorney decides "the means by which [these objectives] are to be pursued." Colo. RPC 1.2(a). This objectives-versus-means distinction is illuminated by the requirement that a criminal lawyer "abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify." *Id.*

### B. Application to the Present Case

We must decide how to characterize a decision to forgo an innocence-based defense in favor of seeking less serious convictions. Is this decision a fundamental one regarding the objectives of the case, or is it merely a strategic one regarding the means of pursuing those objectives? We hold it is the former: a decision to forgo a defense of complete innocence (however strategically sound this decision may be) cannot be made by counsel over a defendant's expressed wishes.

### 1. Case Law

Neither the United States Supreme Court nor our supreme court has addressed this issue directly, but their decisions point in the direction of our holding. Other courts addressing the issue have precluded defense counsel from forgoing an innocence-based defense over a defendant's express objection.

The Supreme Court has held that, because a defendant personally must decide whether to plead guilty, defense counsel may not override the defendant by agreeing to a truncated trial that is the "equivalent of a guilty plea." *Brookhart v. Janis,* 384 U.S. 1, 7, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966). It subsequently ruled that conceding guilt during the first phase of a death penalty case was not the equivalent of a guilty plea. *Florida v.*

*Nixon,* 543 U.S. 175, 187–89, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004). Counsel there "was obliged to, and in fact several times did, explain his proposed trial strategy to" the nonresponsive defendant but "was not additionally required to gain express consent before conceding" guilt. *Id.* at 189, 125 S.Ct. 551. The Court's precise holding was "[w]hen counsel informs the defendant of the strategy counsel believes to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent." *Id.* at 192, 125 S.Ct. 551. A leading authority describes *Nixon* as apparently "based on the assumption that the client had the final word, although the decision was not so personal to the client that counsel could not proceed where the client was unresponsive." La-Fave, *supra,* § 11.6(b), at 790.

*Faretta* is based on a defendant's right to autonomy in making the most fundamental decisions affecting the case. Indeed, even the three dissenting justices there cautioned: "This is not a case where defense counsel, *against the wishes of the defendant* or with inadequate consultation, has adopted a trial strategy that significantly affects one of the accused's constitutional rights. For such overbearing conduct by counsel, there is a remedy." 422 U.S. at 848, 95 S.Ct. 2525 (Blackmun, J., with Burger, C.J., and Rehnquist, J., dissenting) (emphasis added; citing *Brookhart*).

In *Hendricks v. People,* 10 P.3d 1231 (Colo.2000), the Colorado Supreme Court recognized "a defendant's interest in autonomous decision making with respect to her choice of defense." *Id.* at 1242 (citing *Faretta*). Against this interest the court balanced a "unique" Colorado statute allowing defense counsel to suggest, and a trial court to interpose, an insanity defense over a defendant's objection. *Id.* at 1235–36 (citing § 16–8–103(2), C.R.S.2008). Even in the insanity context, the court concluded "an individual's interest in autonomously controlling the nature of her defense, provided that interest is premised on a choice that satisfies the basic rationality test, will predominate over the broader interest of society unless pressing concerns mandate a contrary result." *Id.* at 1243 (citing *Faretta* and other cases recognizing defendants' right to make personal decisions regarding defense).

*Arko* is our supreme court's most recent pronouncement in this area. The issue there was whether counsel may seek lesser offense instructions over a defendant's objection. The court gave counsel the final word because this decision was a "strategic and tactical" one "not analogous to the decision whether to plead guilty." 183 P.3d at 558. In so holding, it reasoned that "a defendant retains all of his trial rights" and "*also retains the opportunity to advocate for outright acquittal.*" *Id.* (emphasis added). Two dissenting justices concluded "the decision to request a lesser non-included offense instruction ... implicates a fundamental right, and therefore must remain with the defendant himself rather than his counsel." *Id.* at 561 (Coats, J., with Eid, J., dissenting).

*Hendricks* and Arko are instructive, but neither controls this case. *Hendricks* recognizes a criminal defendant's constitutionally-based interest in choosing a defense. It does not suggest this interest could give way to counsel's strategic judgment, but allows it to be overridden *by a court* (not by counsel alone) only in "limited" circumstances where there is a "critical concern ... that the defendant's rationale [may be] impeded by a potentially decision-affecting mental condition." 10 P.3d at 1243–44 & n. 14; *see also People v. Anderson,* 70 P.3d 485, 487 (Colo. App.2002) ("Ordinarily, a defendant who is competent to stand trial has the right to determine the nature of his or her defense and, correspondingly, what plea to enter.") (citing Hendricks and other cases). Arko did address whether a particular decision was controlled by a defendant or counsel, but unlike here, the decision was not whether to abandon any argument for "outright acquittal." 183 P.3d at 558.

The closest case we have found is *State v. Carter,* 270 Kan. 426, 14 P.3d 1138 (2000). There, defense counsel's opening statement in a first degree murder case essentially conceded Carter's involvement in the killing, stating it was "a product of rage and panic, but it was not a premeditated killing." *Id.* at

1143. When Carter objected to counsel's refusal to present an innocence-based defense, the trial court offered the same choice given defendant here: proceed with counsel's lesser offense strategy or represent himself. *Id.* at 1141–43. Carter chose the former and was convicted after a trial in which he was represented by counsel. The Kansas Supreme Court unanimously reversed the first degree murder conviction, rejecting the prosecution's argument that the dispute involved "a matter of defense strategy rather than a fundamental right." *Id.* at 1144. It held that "imposing a guilt-based defense against Carter's wishes violated his Sixth Amendment right to counsel and denied him a fair trial." *Id.* at 1148.

Similarly, in *State v. Anaya*, 134 N.H. 346, 592 A.2d 1142 (1991), the New Hampshire Supreme Court reversed a murder conviction where counsel argued Anaya was guilty only of second degree rather than first degree premeditated murder. The court held this argument impermissibly overrode the wishes of a defendant who had "refused to plead guilty to the very jury finding urged by his counsel," "testified … he was innocent of … both first and second degree murder," and "urged counsel to argue his total innocence." *Id.* at 1146.

Other state supreme courts also have reversed murder convictions where counsel argued for lesser homicide offenses while refusing to make an innocence defense. *See, e.g., Jones v. State*, 110 Nev. 730, 877 P.2d 1052, 1055–57 (1994) (reversing conviction because by conceding defendant killed victim but arguing there was no premeditation "counsel undermined his client's testimonial disavowal of guilt"); *People v. Frierson*, 39 Cal.3d 803, 218 Cal.Rptr. 73, 705 P.2d 396, 403–05 (1985) (defendant entitled to require counsel to make diminished capacity defense at guilt phase of trial even though this "will inevitably impinge on defense counsel's handling of the case" because counsel cannot "override defendant's express wishes on a matter of fundamental importance"); *but cf. People v. Jones*, 53 Cal.3d 1115, 282 Cal. Rptr. 465, 811 P.2d 757, 770–72 (1991) (distinguishing *Frierson* in upholding unique form of hybrid representation where defendant personally argued innocence while counsel argued defendant's mental impairment in seeking conviction on lesser homicide offense).

The Kentucky Supreme Court, citing a defendant's personal "Sixth Amendment right to present his defense of innocence," reversed a capital murder conviction where the attorney had presented an insanity defense over the defendant's objection. *Jacobs v. Commonwealth*, 870 S.W.2d 412, 417–18 (Ky.1994). Most other courts to address the issue likewise vest in a competent defendant the decision whether to raise an insanity defense. *E.g., United States v. Marble*, 940 F.2d 1543, 1547–48 (D.C.Cir.1991); *Johnson v. State*, 117 Nev. 153, 17 P.3d 1008, 1013–15 (2001); *State v. Bean*, 171 Vt. 290, 762 A.2d 1259, 1265–68 (2000); *Commonwealth v. Federici*, 427 Mass. 740, 696 N.E.2d 111, 114–15 & n. 5 (1998); *Treece v. State*, 313 Md. 665, 547 A.2d 1054, 1057–63 (1988); *State v. Jones*, 99 Wash.2d 735, 664 P.2d 1216, 1219–21 (1983); *see also Moore v. Johnson*, 194 F.3d 586, 605–06 (5th Cir.1999) (because a defendant "is presumed to be the master of his own defense," counsel was not deficient by raising "implausible" and "untenable" alibi defense insisted on by defendant); *Lowenfield v. Phelps*, 817 F.2d 285, 292 (5th Cir. 1987) (counsel properly raised alibi defense requested by his client rather than insanity defense because the defendant's "instructions were entitled to be followed"), *aff'd on other grounds*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

2. Analysis

■ A defendant's clearly established rights to decide personally whether to plead guilty and whether to testify in his own behalf would be meaningless if the defendant did not also have the final word on whether to forgo a defense of innocence. In the present case, for example, it would have made strategic sense for defense counsel to seek a plea to an offense less than first degree murder. But even if counsel had negotiated such a favorable offer, the decision to accept or reject it would have belonged to defendant. Similarly, even if sound strategy favored keeping defendant off

the witness stand, the decision whether to testify ultimately belonged to him. Defendant's constitutional rights to proclaim his innocence through a not guilty plea and through his own testimony cannot be eviscerated by his counsel's contrary positions.

The proper course is charted by Colorado's ethics rules coupled with our supreme court's "captain of the ship" metaphor. *Arko*, 183 P.3d at 558 (quoting *Steward*, 179 Colo. at 34, 498 P.2d at 934). A defendant is entitled to decide his ultimate "objective" (Colo. RPC 1.2(a)) or, to extend the supreme court's metaphor, the port he would like to reach. This entitlement, *Arko* makes clear, is not all or nothing. Attorneys who reasonably believe they might not be able to reach the client's desired destination may argue for somewhere short of it. What they may not do is abandon entirely a defendant's chosen objective by arguing affirmatively against it.

Here, defendant's clear objective, from the first trial at which he refused to seek lesser convictions that would have spared his life, was outright acquittal. However unlikely that prospect, his own counsel could not deny him the chance.

Contrary to defendant's clear objective, his appointed attorneys refused to raise a defense of complete innocence. Their only defense was that defendant lacked the premeditation and intent necessary for first degree murder. This may have been a reasonable defense given the weight of the evidence, but the person whose liberty was at stake wanted a defense of complete innocence.

No matter how overwhelming the evidence, a criminal defendant is entitled to an innocence defense. As Justice Byron White explained, "absent a voluntary plea of guilty, we also insist that [defense counsel] defend his client whether he is innocent or guilty." *United States v. Wade*, 388 U.S. 218, 257, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (White, J., joined by Harlan and Stewart, JJ., dissenting in part and concurring in part). Defense counsel thus is required "to put the State to its proof, to put the State's case in the worst possible light, regardless of what he thinks or knows to be the truth." *Id.* at 258, 87 S.Ct. 1926.

Here, the self-defense claim defendant wanted counsel to raise was a defense of complete innocence. *People v. Bercillio,* 179 Colo. 383, 385, 500 P.2d 975, 976 (1972) (defendant's "theory of innocence was predicated on self-defense"); *see also* § 18–1–701(1), C.R.S.2008 (under self-defense provisions, "conduct which would otherwise constitute an offense is justifiable and not criminal"). While it is an affirmative defense, requiring a defendant to "present some credible evidence on that issue," § 18–1–407(1), C.R.S.2008, this means just a "scintilla of evidence": some evidence viewed most favorably to the defendant that could support a jury finding in his favor. *People v. Saavedra–Rodriguez,* 971 P.2d 223, 228 (Colo.1998). Once properly raised, the prosecution bears the burden of disproving self-defense beyond a reasonable doubt. *See* § 18–1–407(2), C.R.S.2008; *Vega v. People,* 893 P.2d 107, 111 (Colo.1995).

Defendant's appointed counsel made clear they were not going to raise self-defense or any other defense of complete innocence. Their refusal to raise self-defense was confirmed by their allowing the procedural deadline to expire. *See* Crim. P. 16(II)(c) (requiring notice of such a defense no later than 30 days before trial).

Defense counsel need not present a defense based on perjury. *See Nix v. White-side,* 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). Here, however, there is no indication this was the basis for counsel's refusal. If counsel believed they were ethically precluded from following defendant's insistence to raise an innocence defense, they should have moved to withdraw based on a conflict of interest. They not only failed to do so, however, but told the court there was no conflict of interest.

The trial court never found defendant had committed perjury; even at sentencing, when criticizing defendant's "incredible" and "preposterous" version of events, it commented, "[P]erhaps over the three and a half years since the events took place, you've convinced yourself that these are the facts." Nor is there any record basis to find counsel ethically could not have presented the defense. *See United States v. Scott,* 909 F.2d 488, 491–94 (11th Cir.1990) (trial court improperly forced

defendant to choose between having counsel or testifying, where record did not clearly show counsel sought to withdraw due to expected perjury); *People v. Boehmer,* 767 P.2d 787, 789 (Colo.App.1988) (record insufficient to deny defendant's claim that he was "deprived of the right to testify under an impermissible threat of loss of assistance of counsel").

### C. Remedy

■ The constitutional right to counsel is not "conditioned upon actual innocence," but rather is "granted to the innocent and the guilty alike." *Kimmelman v. Morrison,* 477 U.S. 365, 380, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). And juries, not courts, must determine whether defendants claiming to be innocent have been proven guilty beyond a reasonable doubt. *See generally Apprendi v. New Jersey,* 530 U.S. 466, 476–83, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Accordingly, improper denial of counsel is a fundamental, structural error invariably requiring reversal of any resulting conviction. *See, e.g., United States v. Gonzalez–Lopez,* 548 U.S. 140, 148–50, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006); *Edwards v. People,* 129 P.3d 977, 988 (Colo. 2006). However convincing the prosecution's proof of guilt, defendant's convictions cannot stand because he unconstitutionally was denied an attorney to advocate for his innocence.

### III. Conclusion

The judgment is reversed and the case is remanded for a new trial consistent with this opinion.

Judge ROTHENBERG and Judge ROMÁN concur.